

**RECEIVED**

DEC 1 5 2015

**CLERK OF DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 4:13-CR-147 |
| v. | FOURTH SUPERCEDING INDICTMENT |
| LI SHAOMING, MO HAILONG, also known as Robert Mo, WANG LEI, WANG HONGWEI, YE JIAN, and LIN YONG, | T. 18 U.S.C. §371 T. 18 U.S.C. §1832(a)(1-5) T. 18 U.S.C. §1834 T. 18 U.S.C. §2314 T. 18 U.S.C. §2323 |
| Defendants. | |

**THE GRAND JURY CHARGES:**

**INTRODUCTORY ALLEGATIONS**

**Background**

1. Beijing Dabeinong Technology Group Company (DBN) is a large Chinese conglomerate based in Beijing. DBN has approximately sixty-seven different subsidiary companies. It produces and sells seed under Jin Se Nong Hua Co., Ltd (also known as Beijing Kings Nower Seed S & T, Co., Ltd).

2. Beijing Kings Nower Seed S & T, Co., Ltd. (BKN) is the wholly owned seed subsidiary of DBN. BKN is headquartered in Beijing, China.

**Associated U.S. Company**

3. Kings Nower North America Company, Inc. (KNNA), believed to be a subsidiary of BKN, was incorporated in Illinois on or about December 6, 2011, by registered agent MO HAILONG, also known as, Robert Mo. The registered offices of KNNA are located at 1100 Sherman Ave., Suite 115, Naperville, Illinois. KNNA purchased and currently

owns real property consisting of approximately forty acres at 26138 S. 104th Avenue, Monee, Illinois. The property consists of farmland, several outbuildings, and a single family residence. The property was purchased by MO HAILONG on behalf of KNNA on March 30, 2012.

**Defendants**

4. Defendant, LI SHAOMING, was Chief Operating Officer of BKN. Defendant, LI SHAOMING, was born in the People's Republic of China (PRC) in 1966 and is a citizen of the PRC. During the times set forth below, LI SHAOMING was in the United States pursuant to a B1/B2 visitor visa.

5. Defendant, MO HAILONG, also known as, Robert Mo, was a resident of Miami, Florida, and Director of International Business of DBN. Defendant, MO HAILONG, was born in the PRC in 1969 and is a citizen of the PRC. He became a Lawful Permanent Resident (LPR) of the United States in May 2005.

6. Defendant, WANG LEI, was a citizen and resident of the PRC, and the Vice Chairman of BKN. Defendant, WANG LEI, was born in the PRC in 1962. During the times set forth below, WANG LEI was in the United States pursuant to a B1/B2 visitor visa.

7. Defendant, WANG HONGWEI, was a resident of Quebec, Canada. WANG HONGWEI is a citizen of Canada and believed to also be a citizen of the PRC. Defendant, WANG HONGWEI, was born in the PRC in 1969. During the times set forth below, WANG HONGWEI was in the United States pursuant to his status as a Canadian citizen.

8. Defendant, YE JIAN, was a resident and citizen of the PRC and was a research manager for BKN. Defendant, YE JIAN, was born in the PRC in 1981. During the times set forth below, YE was in the United States pursuant to a B1/B2 visitor visa.

9.    Defendant, LIN YONG, was a resident and citizen of the PRC and was an employee of BKN. Defendant, LIN YONG, was born in the PRC in 1976. During the times set forth below, LIN was in the United States pursuant to a B1/B2 visitor visa.

**Victim Companies**

10.    Pioneer Hi-Bred International, Inc. is a seed manufacturer located in Johnston, Iowa. Pioneer is a wholly owned subsidiary of DuPont, a corporation headquartered in Wilmington, Delaware. Pioneer sells seed under its company name. Pioneer utilizes research and production fields in numerous locations including, but not limited, to Iowa and Illinois.

11.    Monsanto Company is a diversified agricultural bio-technology company that sells seed using a variety of brand names, including Dekalb for its corn seed. Monsanto is headquartered in St. Louis, Missouri. Monsanto utilizes production fields and facilities in numerous locations including, but not limited, to Iowa and Illinois.

**Trade Secrets**

12.    Pioneer 1, 2, 3, 4, 5, and 6 are proprietary lines of male inbred corn seed that constitute valuable trade secrets of Pioneer.

13.    Monsanto 1, 2, and 3 are proprietary lines of male inbred corn seed. Monsanto 4 is a proprietary line of female inbred corn seed. These lines constitute valuable trade secrets of Monsanto.

**Corn Breeding Process**

14.    Germplasm is the genetic makeup of an organism. Corn germplasm is valuable intellectual property of a corn seed breeding and development company. A seed company can develop germplasm that exhibits certain "traits." Germplasm can be

enhanced through selection of superior plants and can also be genetically modified

through the use of biotechnology to exhibit and enhance desired traits. Examples of traits

are disease resistance, pest resistance, and drought resistance. Germplasm is contained in

both hybrid and inbred seed products of a seed company. Germplasm contains the

scientific and technical information utilized to develop and produce inbred and hybrid

corn seed.

15. A corn plant has separate male and female flowering parts—the tassel produces pollen

and is the male part of the plant while the ear that contains the actual corn kernels is the

female part. Each corn ear consists of several hundred kernels attached to the ear. Each

kernel begins as an ovule and is fertilized by pollen from the tassel. A corn plant is a

naturally cross-pollinated plant, i.e., most kernels are pollinated from surrounding plants.

However, some kernels will be self-pollinated from pollen from the tassel of the same

plant.

16. Every year corn breeders select seed from the best plants to use to grow corn the next

season in an attempt to create higher yields. Beginning in the early 20th Century in North

America, corn breeders discovered that if a corn plant was continually self-pollinated

only (rather than being cross-pollinated) for six or more generations, an "inbred" (also

referred to as "parent") line of seed could be developed. An inbred line of seed develops

smaller plants but they are more uniform in desired traits. An inbred seed is genetically

uniform and is "pure," i.e., it will identically reproduce each successive year. When two

inbred lines are cross-pollinated, the resulting offspring is a hybrid seed. A hybrid

developed from two superior inbred lines will be a more robust and vigorous plant

resulting in higher yields. However, seeds from hybrid plants are not planted to

4

reproduce hybrid plants in successive years because the resulting second generation hybrid plants are non-uniform, less vigorous, and result in significantly lower yields. Therefore, seed customers must purchase new first generation hybrid seeds every year. Development of successful inbred lines of seed consumes significant resources of a seed company. A seed company employs many PhD–level scientists and other highly trained personnel to develop and evaluate inbred lines. Inbred seeds cannot be evaluated solely on their own for desired characteristics but instead must be evaluated for their test cross capabilities. Extensive work and research is conducted to determine which inbred lines exhibit superior test cross performance. Seed companies seek to utilize inbred lines that are easy to maintain and easy to cross so that hybrid seed production costs are minimized while maximizing results.

17.     In addition to utilizing company owned plots of land to conduct evaluations of inbreds and test cross performance, seed companies rely primarily on "contract growers." A contract grower is a private farmer that independently contracts with the seed company to grow a particular product. Contract grower fields can be used as either "research" fields (also referred to as "test" fields), or the field can be used as a "production" field. Research fields are fields being used to conduct testing and research of future products the company hopes to commercially produce and market. A research field can be utilized to grow hundreds of different inbreds and hybrids for evaluation. A production field is utilized to grow male and female inbred lines to produce (or that will cross with one another in a controlled manner to produce) hybrid seeds that will then be sold to farmers in coming years. A standard contract requires the grower to plant and cultivate the seed provided by the seed company without knowledge of the product in question. Typically,

a contract grower is not provided with specific information about the seed in question, including, but not limited to, the name of the product, the particular traits of the product, and whether the seed is being grown for research or production purposes.

18. In production fields, seed companies hire contract growers to plant inbred seed for the production of hybrid seed, which will be sold to farmers in later years. For the production of hybrid seed, the seed companies determine which inbred seeds will be used to produce male inbred plants and which will be used to produce female inbred plants. Because an individual corn plant has both male and female components, the contract growers must manipulate the plants in order to determine which plants will be male plants and which will be female plants. Crossing the male plants with the female plants in the production fields will produce hybrid seeds.

19. Some of the inbred plants in a production field are detassled. These are the plants determined to be the female plants, or the ones that will perform the female function in the hybrid production process. This is accomplished by removing the tassels (the male part of a corn plant) shortly after the tassels emerge from the sheaths of the plants. The tassels from other inbred plants are left intact. These are the plants that will be the male plants. Pollen from the tassels of these male plants will pollinate the surrounding female plants, which had their tassels removed. The ears of corn that eventually grow on the female plants will contain the hybrid seed.

20. The determination of which inbred plants will be used as male plants and which will be used as female plants is generally determined by the characteristics of each line. Inbred seed lines that produce plants with high pollen levels are normally preferred as male plants. Inbred lines that yield a high number of kernels are preferred as female plants.

6

Each of the seed companies determines the ratio of male to female plants in their production fields. The ratio is usually one male row of plants for every four female rows. The planting of male and female plants can be timed to insure synchronization of male and female flowering. Many times, males are planted on multiple dates to ensure good pollination. When seed companies extract the hybrid seeds from their production fields at the end of the growing season, they harvest only the female plants because the ears of these plants contain the hybrid seeds.

21.     However, a small percentage of the harvested seeds from a production field also contain some inbred seed. Even though the female plants' tassels are removed, a very small percentage of ovules on the female ears will be self-pollinated. This can come from tassels that were missed during the process of removing the female tassels. This results in a hybrid ear of corn containing approximately slightly less than one percent of its kernels that were self-pollinated from a female inbred plant. These few kernels are called female inbred seeds. Thus, every commercial bag of hybrid seed will contain a very small percentage of female inbred seed. When a bag of hybrid seed is planted, the inbred seed in that bag is also planted and will grow; however, due to an inbred seed producing a plant that is shorter and much less robust, it will be crowded out by the more robust and vigorous surrounding hybrids for water and sun and the inbred plants can die.

### Theft of Inbred Seeds

22.     The inbred seed of a seed company can be stolen by a variety of methods. The easiest and most straightforward method to steal inbred seed is to obtain the inbred seed directly. This could be accomplished by one of the following ways:

   a.     A seed company employee can provide the inbred seed directly.

7

b.      Spring Planting Season: If a production or research field of a seed company is identified, an individual can dig up a seed before that seed germinates in the spring. Inbred seed from both male and female plants can be obtained in this manner.

c.      Fall Harvest Season: If a production or research field is identified, an individual can obtain actual ears of corn from mature plants. The kernels obtained from male plants would be pure male inbred seed; however, the ears obtained from the female plants would be mostly hybrid corn. An individual would then have to plant the seed and examine the individual plants to determine which kernels were likely female inbred seed. Due to this difficultly, an individual trying to steal female inbred seed would be more successful digging seed prior to germination in the spring.

d.      "Selfing" of a hybrid: An individual could successively self-pollinate, or "self," an elite hybrid for six or more seasons to get back to the underlying inbred seed that was utilized to breed that hybrid. However, the finished inbred will not be exactly what was used to create the hybrid. Another method to accomplish this would be to plant a bag of hybrid seed, identify the female inbred plant(s) after germination, and then isolate the inbred plant by cutting down surrounding hybrid plants so the inbred continues to receive sufficient sun and nutrients to grow and produce inbred ears of corn. Due to the ability to "self" a hybrid, or isolate a female inbred by growing hybrid seed and cutting down the surrounding hybrid plants, and/or subjecting a hybrid seed to scientific analysis, seed companies require their customers to

8

sign and agree to a "use restriction" and/or "technology" agreement before
being allowed to purchase hybrid seed. These agreements, in general, restrict
a farmer from taking any kind of activity that would allow that farmer to
extract the underlying inbred seed utilized to produce that hybrid.

**Protection of Intellectual Property**

23.     Pioneer Hi-Bred and Monsanto employ steps to protect their intellectual property, i.e.
their corn germplasm, including but not limited to:

a.      At their research facilities and production facilities, visitor access is controlled.
Identification badges, controlled-area access, and visitor logs are utilized.

b.      Use of company computer networks is controlled, access restricted, and
monitored.

c.      Security cameras and building access is monitored.

d.      Record-keeping and tracking of test seed is conducted.

e.      Contract growers are not told what type of seed product they are growing. This is
to protect the confidentiality of the product being grown. A company's field
manager delivers the seed to be grown to the contract grower in unmarked, non-
descript bags. Oftentimes this seed is delivered very close to planting time to
lessen the chance of the seed being stolen or otherwise being illegally transferred.

f.      The seed is grown in unmarked non-attributable fields to try and protect the
confidentiality of the product being grown.

g.      At particularly sensitive field locations, fields are monitored by seed company
security personnel and/or subjected to increased field visits by company
representatives.

9

h.   Use of technology agreements are required by all customers purchasing a company's seed. These agreements restrict anyone purchasing the seed from conducting any type of experiments, or shipping or transporting the seed to overseas locations.

i.   Patents and Plant Variety Protection Act certificates can be obtained for proprietary seed products.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 1
### (Conspiracy to Steal Trade Secrets)

24.   The allegations contained in Paragraphs 1 through 23 are re-alleged and incorporated as if fully set forth herein.

25.   Beginning at least as early as in or about January of 2007, and continuing to in or about February of 2013, in the Southern District of Iowa and elsewhere, the Defendants:

> LI SHAOMING,
> MO HAILONG, also known as Robert Mo,
> WANG LEI,
> WANG HONGWEI,
> YE JIAN, and
> LIN YONG,

together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to:

a.   knowingly steal, and without authorization appropriate, take, carry away, and conceal trade secrets belonging to Pioneer Hi-Bred and Monsanto, in violation of 18 U.S.C. § 1832(a)(1);

b.    knowingly and without authorization transmit, deliver, send, and mail trade secrets belonging to Pioneer Hi-Bred and Monsanto, in violation of 18 U.S.C. § 1832(a)(2); and

c.    knowingly receive and possess trade secrets belonging to Pioneer Hi-Bred and Monsanto, knowing the same to have been stolen, appropriated, obtained, and converted without authorization, in violation of 18 U.S.C. § 1832(a)(3);

intending to convert a trade secret that is related to a product, namely proprietary inbred and hybrid corn seed, that is used in or intended for use in interstate and foreign commerce, to the economic benefit of someone other than Pioneer Hi-Bred or Monsanto, and intending and knowing that the offense will injure the owners of said trade secrets.

### Manner and Means of the Conspiracy

26.    Among the means and methods by which the defendants and their co-conspirators stole, attempted to steal, appropriated, and took, inbred corn seed constituting the intellectual property of the victim seed companies, was to: 1) dig up and steal inbred corn seeds from fields utilized by the victim seed companies before spring germination; 2) steal mature ears of inbred corn seed from fields utilized by the victim seed companies during the fall harvest season; and 3) steal or otherwise unlawfully obtain packaged hybrid corn seed constituting the intellectual property of the victim seed companies from an unauthorized source.

### Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, the Defendants:

> LI SHAOMING,
> MO HAILONG, also known as Robert Mo,
> WANG LEI,
> WANG HONGWEI,
> YE JIAN, and
> LIN YONG,

and their co-conspirators and agents committed and caused to be committed the following

overt acts, among others, on or about the following dates in the Southern District of Iowa

and elsewhere:

27.    On or about January 16, 2007, Defendant, LI SHAOMING, advised Defendant, MO

HAILONG, also known as, Robert Mo, that, "Mo Yun is in charge of the specifics from

the China side. She will contact you and work with you. I hope we can gather 100

pieces of the top notch corn hybrids or inbreeds currently available in the U.S. this year.

It's even better if we can collect the elite breeds that are being tested...."

28.    On or about January 18, 2007, Defendant, MO HAILONG, and Mo Yun discussed what

seeds to collect. Mo Yun instructed Defendant, MO HAILONG, to "....send to Dr. Li, he

can check which is better."

29.    On or about June 29, 2007, Defendant, MO HAILONG, and Mo Yun discussed the

advantages of purchasing farmland to facilitate their plans. Defendant, MO HAILONG,

advised Iowa farmland is affordable. Defendant, MO HAILONG, stated the purchase of

land would be good for business as they could hire 2-3 individuals from DBN and plant

to get the "parent of germplasm." Mo Yun agreed and instructed Defendant, MO

HAILONG, to contact the farms' owners to learn more about their purchase.

30.    On or about September 17, 2007, Mo Yun asked Defendant, MO HAILONG, if he could get any corn. Defendant, MO HAILONG, explained it's easy to pick and take pictures but caution is needed to drive somewhere unseen as more vehicles are passing by.

31.    From on or about September 28, 2007 to on or about October 1, 2007, Defendant, Mo Hailong, collected corn seed from fields in and about Missouri, Iowa, and Illinois.

32.    On or about October 31, 2007, Defendant, LI SHAOMING, told Defendant, MO HAILONG, he will be speaking with Mo Yun about sending additional personnel to assist Defendant, MO HAILONG, with seed collection activities.

33.    On or about January 2, 2008, Mo Yun informed Defendant, MO HAILONG, that Defendant, LI SHAOMING, is very glad to see the performance of the seeds Defendant, MO HAILONG, had sent. Mo Yun told Defendant, MO HAILONG, that his work in the United States is very important to Defendant, LI SHAOMING's, plan. Mo Yun told Defendant, MO HAILONG, that "Zhang Hongwei" was asked to test the DNA of all important seeds.

34.    On or about May 14, 2008, Defendant, MO HAILONG, purchased real property located at the northwest corner of 298th Place and Amarillo Avenue near Redfield, Iowa.

35.    On or about April 4, 2009, Defendant MO HAILONG, also known as, Robert Mo, rented storage locker #48 at A&M Mini Self-Storage located at 420 Nile Kinnick North, Adel, Iowa.

36.    On or about May 3, 2011, Defendants, MO HAILONG, also known as, Robert Mo, and WANG LEI, were observed in and near a field containing recently planted inbred corn seed constituting the intellectual property of Pioneer Hi-Bred, located at or near Dysart, Iowa. Defendant, MO HAILONG, was observed on his knees digging in the field.

13

Defendant, WANG LEI, was observed in the driver's seat of a nearby car. After being

confronted by a Pioneer Field Manager, Defendant, MO HAILONG, advised he was an

employee of the University of Iowa travelling to a conference in the area. When the

Pioneer Field Manager was distracted by a phone call, Defendants, MO HAILONG and

WANG LEI, left the area in the car operated by WANG LEI at a high rate of speed.

37.   On or about September 6, 2011, Defendants, MO HAILONG, also known as, Robert Mo,

WANG LEI, and LI SHAOMING, were observed in and near a field containing inbred

corn seed constituting the intellectual property of Monsanto, located at or near

Bondurant, Iowa.

38.   On September 27, 2011, Defendant, MO HAILONG, mailed 15 packages to his residence

at 22130 Candle Court, Boca Raton, FL. The packages, which ranged in weight from 13

to 40 pounds each, were mailed from a United Parcel Service (UPS) store in West Des

Moines, Iowa. Defendant, MO HAILONG, described the contents of the UPS package to

be "corn samples." The total weight of the packages was 341.27 pounds. The total

shipping charge was $1,152.97.

39.   On or about March 30, 2012, Defendant, MO HAILONG, also known as, Robert Mo, and

KNNA purchased real property located at 26138 South 104th Avenue, Monee, Illinois.

40.   On or about May 11, 2012, Defendants, MO HAILONG, also known as, Robert Mo, YE

JIAN, and LIN YONG, attempted to ship approximately 250 pounds of corn seed,

packaged in forty-two, five-gallon zip-lock bags contained in five separate boxes, from

Federal Express in Orland Park, Illinois to Mr. Chan, Set Logistics Company, LTD., in

Hong Kong.

14

41.  On or about May 15, 2012, Defendants, YE JIAN, and LIN YONG, provided false information about their association, their employment, and the nature of their recent travel when questioned by federal agents at the Seattle-Tacoma International Airport immediately prior to their return flight to China.

42.  On or about August 28, 2012, Defendants, YE JIAN and LI SHAOMING, and others, visited storage locker #E17 at Infinite Self-Storage located at 21827 South Schoolhouse Road, New Lenox, Illinois.

43.  On or about August 30, 2012, at 6:09 pm, Defendant, YE JIAN, advised Defendant, LIN YONG, that they would receive instructions from Defendant, LI SHAOMING.

44.  On or about August 30, 2012, at approximately 6:37 pm, Defendant, LIN YONG, advised Defendant, YE JIAN, to expect inquiry from Defendant, LI SHAOMING, as to their daily productivity.

45.  On or about August 31, 2012, at approximately 11:18 pm, Defendant, LIN YONG, warned Defendant, YE JIAN, that they must be careful not to get caught by police, indicating the police sometimes hide themselves.

46.  On or about August 31, 2012, and continuing to on or about September 3, 2012, Defendants, YE JIAN, LIN YONG, LI SHAOMING and WANG HONGWEI, did work together to remove inbred and hybrid corn seed constituting the intellectual property of Pioneer Hi-Bred and Monsanto from fields in and about Illinois.

47.  On or about August 31, 2012, at approximately 1:45 pm, Defendant, LIN YONG, commented to Defendant, YE JIAN, they must show Defendant, LI SHAOMING, how heavy their workload has been over the previous two days.

15

48.    On or about August 31, 2012, at approximately 3:03 pm, Defendant, LIN YONG, advised

       Defendant, YE JIAN, "Dr. Li will assign work for us, otherwise we won't know where

       we should be going."

49.    On or about September 1, 2012, at approximately 7:32 am, Defendant, LIN YONG,

       informed Defendants, YE JIAN and WANG HONGWEI, that Defendant, LI

       SHAOMING, is very stubborn and during last year's operation, Defendant, LI

       SHAOMING, argued with Defendants, WANG LEI and MO HAILONG, the entire time.

50.    On or about September 1, 2012, at approximately 8:31 am, Defendant, YE JIAN,

       informed Defendant, LIN YONG, there could be lots of duplications in the samples they

       have collected. Defendant, LIN YONG, agreed with Defendant, YE JIAN, stating during

       last year's operation, Defendant, LI SHAOMING, collected over 300 samples of which

       100 were duplicates.

51.    On or about September 1, 2012, at approximately 5:22 pm, Defendant, LIN YONG,

       engaged in conversation with Defendant, YE JIAN, concerning the risk involved in

       removing inbred corn seed from U.S. fields. Defendant, LIN YONG, stated "these are

       actually very serious offenses." Defendant, YE JIAN, replied "they could treat us as

       spies." Defendant, LIN YONG, stated "that is what we've been doing…what I'm trying

       to say is, as for the charges there could be several…trespassing other people's private

       property, that's one. Second is theft, and the third is the violation of IP law. That'd be

       three charges." Later in the conversation, Defendant, LIN YONG, stated "these are

       private properties, entering without permission is considered a criminal offense."

       Defendant, LIN YONG, continued "taking things from a property is theft. When the

       number of stolen goods reaches a certain amount, it becomes IP violation. Nowadays the

16

U.S. is very hostile to China on this matter." Defendant, LIN YONG, continued "if they

max the punishment, then we will be done...I mentioned it to Dr. Li that I don't agree on

running this project for such a long time." Defendant, YE JIAN, replied, "the longer it

lasts the more likely we get into trouble."

52.    On or about September 1, 2012, at approximately 5:42 pm, Defendant, LIN YONG,

advised Defendant, YE JIAN, that if they are caught stealing technological secrets it

would not be good for them or the company, and affects the country (PRC) and the

government. Defendant, LIN YONG, replied that Defendant, LI SHAOMING, has

thought about matters at this level and still wants Defendants, LIN YONG and YE JIAN,

to continue.

53.    On or about September 1, 2012, at approximately 5:50 pm, Defendant, LIN YONG,

advised Defendant, YE JIAN, "Entering into others' fields...theft, IP, any one of them is

very severe." Defendant, YE JIAN laughed and stated "others think that we are spies

sent from China." Defendant, LIN YONG, replied "It's for sure that we are considered

as such."

54.    On or about September 1, 2012, at approximately 7:37 pm, Defendant, LIN YONG,

asked Defendant, YE JIAN, "for example, if we were stopped by police and asked about

what we are doing? How will we answer that?" Defendant, YE JIAN, responded "It'll

depend on where. The only thing to do, if it's in the fields, would be that we are

students...working on surveys." Defendant, LIN YONG, stated "surveys for the U.S.

agricultural production." Defendant YE JIAN, replied "Right."

55.    On or about September 11, 2012, Defendants, LI SHAOMING and YE JIAN, visited

storage locker #48 at A&M Storage Locker in Adel, Iowa.

56.    On or about September 23, 2012, Defendants, LI SHAOMING and YE JIAN, visited

storage locker #48 at A&M Storage Locker in Adel, Iowa.

57.    On or about September 25, 2012, Defendants, LI SHAOMING and YE JIAN, visited

storage locker #E17 at Infinite Self-Storage in New Lenox, Illinois.

58.    On or about September 27, 2012, Defendants, LI SHAOMING and YE JIAN, packaged

corn seed for reshipment at storage locker #E17 at Infinite Self-Storage in New Lenox,

Illinois.

59.    On or about September 28, 2012, Defendants, LI SHAOMING and YE JIAN, loaded

corn seed from within storage locker #E17 at Infinite Self-Storage in New Lenox, Illinois

and transported said corn seed to the property located at 26138 South 104th Avenue,

Monee, Illinois.

60.    On or about September 29, 2012, Defendants, MO HAILONG, also known as, Robert

Mo, LI SHAOMING, WANG HONGWEI, YE JIAN, and others, prepared the corn seed

for transport to China.

61.    On or about September 29, 2012, Defendant, MO HAILONG, also known as, Robert Mo,

instructed Defendant, YE JIAN, on the importance of thoroughly cleaning the vehicles

utilized to steal corn seed. Defendant, MO HAILONG, stated "this is not

optional...before...this, when we were working we washed that car twice...washed and

wiped it clean twice. Still not enough." Later in the conversation, Defendant, MO

HAILONG, stated "when the car got too dirty, Wang Lei, Dr. Li and I washed the car

together. Uh, they were very happy doing it and felt good too." Defendant, YE JIAN,

replied "we do some cleaning. The car has been washed many times." Defendant, MO

HAILONG, stated "car washed...I vacuumed the inside of the car twice. Last time when

we returned the car, you guys finished and left, I went back and vacuumed it for one more time. Because I, well, I like to pay attention to details...I did not want to leave any traceable marks or clues in the car." Defendant, YE JIAN, replied "Right. Not a single kernel of corn was left behind."

62.     On or about September 30, 2012, Defendant, MO HAILONG, also known as, Robert Mo, transported an unknown quantity of corn seed constituting the intellectual property of Pioneer Hi-Bred and Monsanto during his flight from Chicago, Illinois to Fort Lauderdale, Florida.

63.     On or about September 30, 2012, Defendant, LI SHAOMING, attempted to smuggle corn seed from in and about Monee, Illinois to China. More specifically, Defendant, LI SHAOMING, concealed approximately 374 small manila envelopes each containing small quantities of corn seed within two boxes of Pop Weaver brand microwave popcorn concealed in an item of checked luggage on his flight leaving Chicago, Illinois destined for Beijing, China. In addition, Defendant, LI SHAOMING, concealed approximately 374 small manila envelopes each containing small quantities of corn seed within 12 brown paper bags concealed in an item of checked luggage on his flight leaving Chicago, Illinois destined for Beijing, China. Each envelope was uniquely marked on the exterior of the envelope. Said corn seed was the intellectual property of Pioneer and Monsanto and included, but was not limited to, Pioneer 1, 2, 3, 4, 5, and 6, and Monsanto 1, 2, 3, and 4.

64.     On or about September 30, 2012, Defendant, YE JIAN, attempted to smuggle corn seed from in and about Monee, Illinois to China. More specifically, Defendant, YE JIAN, concealed approximately 100 Subway napkins each containing small quantities of corn

seed within two boxes of Orville Redenbacher brand microwave popcorn concealed in an item of checked luggage on his flight leaving Chicago, Illinois destined for Beijing, China. In addition, Defendant, YE JIAN, concealed approximately 30 Subway napkins each containing small quantities of corn seed in the pockets of shorts contained in an item of checked luggage on his flight leaving Chicago, Illinois destined for Beijing, China. In addition, Defendant, YE JIAN, concealed an additional quantity of Subway napkins each containing a small quantity of corn seed on his person as he boarded his flight leaving Chicago, Illinois destined for Beijing, China. Said corn seed was the intellectual property of Pioneer and Monsanto and included, but was not limited to, Pioneer 1, 2, 3, and 4, and Monsanto 3.

65. On or about September 30, 2012, Defendant, WANG HONGWEI, attempted to smuggle corn seed from in and about Monee, Illinois to Canada. More specifically, Defendant, WANG HONGWEI, concealed approximately 44 small brown bags, each containing approximately 30 smaller manila envelopes containing small quantities of corn seed, in and about a backpack underneath the seats of the car he was attempting to drive across the border into Canada at the Highgate Border Crossing near Highgate, Vermont. Each envelope was uniquely marked on the exterior of the envelope. Said corn seed was the intellectual property of Pioneer and Monsanto and included, but was not limited to, Pioneer 4 and 5, and Monsanto 3.

This is a violation of Title 18, United States Code, Section 1832(a)(5).

20

**THE GRAND JURY FURTHER CHARGES:**

<u>**COUNT 2**</u>
**(Conspiracy to Transport Stolen Property)**

66.    The allegations contained in Paragraphs 1 through 23 are re-alleged and incorporated as

if fully set forth herein.

67.    Beginning at least as early as in or about January of 2007, and continuing to in or about

February of 2013, in the Southern District of Iowa and elsewhere, the Defendants:

> LI SHAOMING,
> MO HAILONG, also known as Robert Mo,
> WANG LEI,
> WANG HONGWEI,
> YE JIAN, and
> LIN YONG,

together with other persons known and unknown to the Grand Jury, knowingly and

willfully conspired and agreed to commit the following offense against the United States:

a.    transport, transmit and transfer in interstate and foreign commerce, goods, wares,

and merchandise, of the value of $5,000 and more, knowing the same to have

been stolen, converted and taken by fraud, in violation of Title 18, United States

Code, Section 2314.

**Manner and Means of the Conspiracy**

68.    The allegations of paragraph 26 are repeated and re-alleged as though fully set forth

herein.

21

### Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, the Defendants:

LI SHAOMING
MO HAILONG, also known as Robert Mo,
WANG LEI
WANG HONGWEI
YE JIAN
LIN YONG

and their co-conspirators and agents committed and caused to be committed the following

overt acts, among others, on or about the following dates in the Southern District of Iowa

and elsewhere:

69.   The allegations of paragraphs 27 through 65 are repeated and re-alleged as though fully

set forth herein.

This is a violation of Title 18, United States Code, Section 371.

### THE GRAND JURY FINDS:

### Notice of Forfeiture

70.   Pursuant to Title 18 United States Code, Section 1834, upon conviction of the offense

alleged in Count 1 of this Indictment the Defendants:

LI SHAOMING,
MO HAILONG, also known as Robert Mo,
WANG LEI,
WANG HONGWEI,
YE JIAN, and
LIN YONG,

shall forfeit to the United States of America:

1.   Any property constituting or derived from any proceeds obtained directly

or indirectly as a result of the commission of such offenses; and any

22

property used, or intended to be used in any manner or part, to commit or

facilitate the commission of the offenses.

This property includes, but is not limited to, the following:

> 26138 South 104th Avenue, Monee, Will County, Illinois. More
> particularly described as: the Southeast Quarter of the Southeast Quarter
> of Section 20, Township 34 North, Range 12 East of the Third Principal
> Meridian, in Will County, Illinois, consisting of 40 acres, more or less,
>
> and
>
> Real property located at the Northwest corner of 298th Place and Amarillo
> Avenue near Redfield, Iowa, more specifically: Parcel "A" of Northwest
> Quarter (NW ¼) of the Southeast Quarter (SE ¼) of Section Thirty-one
> (31), Township Seventy-nine (79) North, Range Twenty-nine (29) West of
> the 5th P.M., Dallas County, Iowa, as shown on the Plat of Survey
> recorded in Book 2008 on Page 4696.

2.      If any of the property described above, as a result of any act or omission of

the defendants,

(a)     cannot be located upon the exercise of due diligence;
(b)     has been transferred or sold to, or deposited with, a third person;
(c)     has been placed beyond the jurisdiction of the Court;
(d)     has been substantially diminished in value; or
(e)     has been commingled with other property which cannot be subdivided
        without difficulty;

the United States of America shall be entitled to forfeiture of substitute

property pursuant to Title 18, United States Code, Section 2323.

3.      Pursuant to Title 18 United States Code, section 981(a)(1)(C) and Title 28, United

States Code, section 2461(c), upon conviction of the offense alleged in Count 2 of

this Indictment, the Defendants shall forfeit to the United States any property, real

or personal, which constitutes or is derived from proceeds traceable to said

violation. The property to be forfeited includes, but is not limited to, a forfeiture

23

money judgment in the amount of proceeds the defendants obtained as a result of such offense.

**A TRUE BILL.**

/s/
FOREPERSON

Kevin E. VanderSchel
Acting United States Attorney

By: __/s Jason T. Griess__
Jason T. Griess
Marc Krickbaum
Assistant United States Attorneys